## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEEDRA AUSTIN-THOMAS<br>22 Sawmill Rd.<br>Medford, NJ 08055<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>LHCG CXLIV LLC<br>509 Scarborough Dr.<br>Suite 308<br>Egg Harbor Twp, NJ 08234<br>　　and<br>LHC GROUP, INC.<br>509 Scarborough Dr.<br>Suite 308<br>Egg Harbor Twp, NJ 08234<br><br>　　　　　　Defendants. | CIVIL ACTION<br><br>No.: _____<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Deedra Austin-Thomas (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. Plaintiff has initiated this action to redress violations by Defendants, LHCG CXLIV, LLC and LHC Group, Inc. (hereinafter collectively referred to as "Defendants," unless indicated otherwise), of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000(d) *et. seq*) and the New Jersey Law against Discrimination ("NJ LAD"). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the District of New Jersey.

5. Plaintiff is proceeding herein (in part) under Title VII, after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, who resides at the address as set forth in the caption.

8. Defendants are national providers of healthcare services that partner with hospitals and health systems across the country to provide care to patients through home health, hospice, including at the location that Plaintiff was physically employed in Egg Harbor Township, NJ.

9. Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common financial controls, and other factors, Defendants are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management such that they may be treated as a single and/or joint employer for purposes of the instant action.

10. For example, while Plaintiff's offer letter indicated that she was being hired to work for Defendant LHC Group, Inc., Plaintiff's paystubs reflected that she was paid and employed by Defendant LHCG CXLIV, LLC.

11. At all times relevant, Defendants acted through their agents, servants and employees, who acted within the scope of their authority, course of employment, and under the direct control of Defendants.

## FACTUAL BACKGROUND

12. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

13. Plaintiff is a black (African American) female.

14. Plaintiff is also Muslim, and she practices the religious beliefs of Islam.

15. Defendants' management and staff were apprised of Plaintiff's religious beliefs, as she openly practiced her religion by, *inter alia*, always wearing religious garb, including a hijab, prayed daily at work, and openly observed religious holidays while at work.

16. Plaintiff began working for Defendants on or about August 28, 2023, as the Director of Clinical Services.

17. While employed as the Director of Clinical Services, Plaintiff was supervised by Defendants' Divisional President of Operations, Dana Foreman (Caucasian and non-Muslim – hereinafter "Foreman").

18. Less than two weeks after the start of her employment with Defendants as Director of Clinical Services, Plaintiff was offered the position of Hospice Executive Director, which she accepted.

19. Plaintiff remained working as Defendants' Hospice Executive Director at the above-captioned location until her ultimate termination on or about May 20, 2024 (discussed further *infra*).

20. While employed as the Hospice Executive Director, Plaintiff was supervised by Defendants' Regional Vice President of Operations, Matthew Sowden (Caucasian and non-Muslim – hereinafter "Sowden").

21. At the time of Plaintiff's hire with Defendants, she was one of three employees of color.

22. During her employment with Defendants, Plaintiff was a very hard-working and dedicated employee, who was not subjected to a history of progressive discipline.

23. In fact, on several occasions, Sowden raved about Plaintiff's performance and complimented her for "hitting quality measures."

24. In addition to the foregoing, Plaintiff was praised regularly for being a "top performer" in terms of her performance as an executive director.

## Racial Discrimination & Retaliation

25. Unfortunately, Plaintiff's work experience with Defendants was tainted by the constant racial and religious discrimination that she was subjected to by Defendants. For example, but not intending to be an exhaustive list:

   a. On several occasions, Defendants' Business Office Manager, Danielle Camillo (Caucasian – hereinafter "Camillo"), made remarks to Plaintiff, such as "you are from the hood" and "you are ghetto." Camillo did not make these comments towards non-Black employees and were made towards Plaintiff to infer the stereotype that all Black individuals were raised in the "hood" and/or are "ghetto."

   b. In addition to the ongoing racial discriminatory remarks from Camillo, discussed *supra*, Camillo also gave Plaintiff a duck in the shape of the middle finger with a big chain around its neck because according to Camillo, Plaintiff was "ducking ghetto." Although the duck was a play on words, Plaintiff found it and Camillo's corresponding commentary (as to why she gave it to Plaintiff) to be extremely offensive and highly inappropriate (in general, let alone in the workplace). Upon information and belief, other employees did not receive such insensitive and inappropriate "gifts" from Camillo.

   c. Around Ramadan of 2024, Plaintiff advised Camillo she would be fasting in accordance with her religious beliefs. In response, Camillo brought Plaintiff another "gift" including cake mix and icing (ingredients to bake a cake). Upon giving Plaintiff this "gift," Camillo stated: "you aren't eating but here is a visual

      for you." This was highly insensitive action taken by Camillo and specifically related to Plaintiff's religious beliefs.

d. Camillo would also send Plaintiff pictures of food and water during certain fasting religious holidays, despite knowing she could not eat or drink. Plaintiff often felt that Camillo took her religious beliefs and the need to fast as a joke.

e. On other occasions, Camillo made comments such as "you are turning the office into the United Nations." Her comments were made in reference to the recent non-White hires made within Plaintiff's department.

f. Furthermore, Camillo also made remarks about the projects and stated that Plaintiff was "from the projects." Plaintiff believed that Camillo was racially stereotyping her, and assumed that just because Plaintiff is black, she must be from the "projects."

g. Camillo's discriminatory and disparate treatment only culminated in the weeks leading up to Plaintiff's ultimate termination, as she gave Plaintiff an alcohol flask, even though Camillo knew that consuming alcohol was against Plaintiff's religious beliefs.

26. As a result of ongoing racial/religious discriminatory treatment that Plaintiff was being subjected to, she was left with no choice but to complain to Defendants' management, including but not limited to Sowden and James Cozine (Regional Sales Director – "Cozine").

27. In response to Plaintiff's complaints of racial/religious discrimination, Sowden and Cozine told Plaintiff "not to make waves," because they did not want Camillo and another employee who was close with her to quit.

28. Thus, Plaintiff's aforesaid complaints of discrimination were completely dismissed and never properly remedied.

29. In addition to the foregoing, Plaintiff also believes that Defendants' Human Resources ("HR") Manager, Jen Boutte (Caucasian, non-Muslim – hereinafter "Boutte") exhibited discriminatory animus and bias towards her.

30. For example, unlike Plaintiff's Caucasian, non-Muslim co-workers, Boutte was very dismissive of Plaintiff, treated her in a rude and condescending manner, and subjected her to disparate treatment.

31. Therefore, Plaintiff also expressed concerns of discrimination/disparate treatment against Boutte to Foreman in or about May of 2024, to which she responded "I'll handle it;" however, nothing improved.

32. Rather, in close temporal proximity to expressing concerns of discriminatory treatment, Plaintiff was abruptly terminated on or about May 20, 2024.

33. On or about May 20, 2024, Plaintiff was informed that she was being terminated for allegedly violating Defendants' code of conduct, specifically that she was allegedly bullying other employees.

34. Plaintiff was also notified that there was an investigation conducted; however, Plaintiff was never interviewed or provided with a chance to dispute any allegations that were made against her or provide her own witnesses as part of Defendants' alleged investigation.

35. Prior to her termination, Plaintiff was never issued any written discipline or warnings regarding her actions towards others or interactions with other employees.

36. Notably, the day before Plaintiff's termination, Camillo quit her employment with Defendants and then returned to work for Defendants shortly after Plaintiff was terminated.

37. Upon information and belief (based on information provided by Defendants to the EEOC and other evidence), the original complaint of bullying came from Camillo after she resigned from Defendants, and Defendants spent only a few hours (if not less) conducting their aforesaid sham investigation into Camillo's complaint of bullying on the same day as Plaintiff's termination.

38. It is obvious that Camillo was clearly favored by Defendants over Plaintiff because of her race and/or religion, as is evidenced by Defendants' management's prior comments in response to Plaintiff's complaints of discrimination (i.e. instructing Plaintiff not to make waves, because Defendants' management did want Camillo and another White employee who was close with Camillo to quit) and that Defendants pretextually terminated Plaintiff so that Camillo would return to work for Defendants.

39. Additionally, all of Plaintiff's efforts to obtain any written documentation pertaining to her termination were denied and/or ignored.

40. Following Plaintiff's termination, she filed a grievance with Defendants' Compliance and Ethics Office about her unlawful termination and in response, was provided a standardized message that her "report has been forwarded to the appropriate area within the Company for follow-up and review."

41. Plaintiff followed up regarding the investigation of her grievance on several occasions; however, she continued to receive standardized messages.

42. On or about June 3, 2024 (after weeks of following up), Plaintiff was informed the investigation was closed; however, Plaintiff was again never interviewed or questioned, despite an alleged investigation having occurred.

**Disability Discrimination**

43. Plaintiff has and continues to suffer from hypertension, a qualifying disability under the NJ LAD.

44. Plaintiff's aforesaid disability, at times, causes her to experience headaches and limits her ability to engage in daily life activities, including but not limited to controlling her blood pressure.

45. Plaintiff apprised Defendants' management of her disability and the symptoms she experiences related to the same.

46. Plaintiff's blood pressure was pretty-well controlled until the end of her employment with Defendants.

47. For example, towards the end of her employment with Defendants, Plaintiff was experiencing significant stress at work based on the foregoing discrimination and the fact that she was being given tasks outside of her normal work duties to complete with no assistance.

48. Less than a week prior to her termination, Plaintiff informed Defendants' management that she was experiencing significant flare ups of her disability, specifically stating that she was having high blood pressure readings, constant headaches (a symptom of hypertension), and that her blood pressure had been so high that the blood vessels in her eyes were breaking.

49. Plaintiff explained to Defendants' management that her exacerbated symptoms were partially being caused by the stress from work and that she felt like she was being given duties beyond the scope of what she was hired to do, with no help.

50. At no point during the aforesaid discussion with Defendants' management did Defendants inquire whether Plaintiff needed a reasonable accommodation, suggest that Plaintiff request a medical accommodation, or provide her with the appropriate paperwork to do so.

51. Instead, Defendants' management seemed to believe that Plaintiff was contemplating quitting her employment with Defendants due to the stress she was experiencing and the impact it was having on her disability.

52. Plaintiff was not intending to quit her employment; however, days later (after her aforesaid discussion with Defendants' management), she was terminated from her employment with Defendants for alleged bullying – which was entirely pretextual for the reasons discussed *supra*.

53. Plaintiff believes and therefore avers that she was terminated in violation of the NJ LAD.

**COUNT I**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**(Religious Discrimination; [2] Retaliation; [3] Hostile Work Environment)**
**-Against Both Defendants-**

54. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

55. Plaintiff is a Muslim individual, who practices the Islam faith.

56. During Plaintiff's employment with Defendants, she was subjected to a hostile work environment because of her religion through harassment, discriminatory jokes, disparate treatment, and other discriminatory actions.

57. Plaintiff reported the aforesaid discriminatory harassment based on her religion to Defendants' management; however, her concerns were ignored and never remedied.

58. Shortly following her complaints of discrimination, Plaintiff was abruptly and pretextually terminated from her employment with Defendants.

59. Plaintiff believes and therefore avers that her religion was a motivating or determinative factor in Defendants' decision to terminate her employment.

60. Plaintiff also believes and therefore avers that she was terminated in retaliation for engaging in protected activity under Title VII.

61. The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to a discriminatory hostile work environment on the basis of her religion and ultimately terminating her employment for discriminatory/retaliatory reasons, constitute violations of Title VII.

## COUNT II
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
(Religious Discrimination; [2] Retaliation; [3] Hostile Work Environment)
-Against Both Defendants-

62. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

63. Plaintiff is a Muslim individual, who practices the Islam faith.

64. During Plaintiff's employment with Defendants, she was subjected to a hostile work environment because of her religion through harassment, discriminatory jokes, disparate treatment, and other discriminatory actions.

65. Plaintiff reported the aforesaid discriminatory harassment based on her religion to Defendants' management; however, her concerns were ignored and never remedied.

66. Shortly following her complaints of discrimination, Plaintiff was abruptly and pretextually terminated from her employment with Defendants.

67. Plaintiff believes and therefore avers that her religion was a motivating or determinative factor in Defendants' decision to terminate her employment.

68. Plaintiff also believes and therefore avers that she was terminated in retaliation for engaging in protected activity under the NJ LAD.

69. The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to a discriminatory hostile work environment on the basis of her religion, and ultimately terminating her employment for discriminatory/retaliatory reasons, constitute violations of the NJ LAD.

## COUNT III
## Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### (Race Discrimination; [2] Retaliation; [3] Hostile Work Environment)
### -Against Both Defendants-

70. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

71. Plaintiff is an African-American/Black individual.

72. During Plaintiff's employment with Defendants, she was subjected to a hostile work environment because of her race through harassment, discriminatory jokes, disparate treatment, and other discriminatory actions.

73. Plaintiff reported the aforesaid discriminatory harassment based on her race to Defendants' management; however, her concerns were ignored and never remedied.

74. Shortly following her complaints of discrimination, Plaintiff was abruptly and pretextually terminated from her employment with Defendants.

75. Plaintiff believes and therefore avers that her race was a motivating or determinative factor in Defendants' decision to terminate her employment.

76. Plaintiff also believes and therefore avers that she was terminated in retaliation for engaging in protected activity under Title VII.

77. The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to a discriminatory hostile work environment on the basis of her race and ultimately terminating her employment for discriminatory/retaliatory reasons, constitute violations of Title VII.

**COUNT IV**
**Violations of the New Jersey Law Against Discrimination ("NJ LAD")**
**(Race Discrimination; [2] Retaliation; [3] Hostile Work Environment)**
**-Against Both Defendants-**

78. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

79. Plaintiff is an African-American/Black individual.

80. During Plaintiff's employment with Defendants, she was subjected to a hostile work environment because of her race through harassment, discriminatory jokes, disparate treatment, and other discriminatory actions.

81. Plaintiff reported the aforesaid discriminatory harassment based on her race to Defendants' management; however, her concerns were ignored and never remedied.

82. Shortly following her complaints of discrimination, Plaintiff was abruptly and pretextually terminated from her employment with Defendants.

83. Plaintiff believes and therefore avers that her race was a motivating or determinative factor in Defendants' decision to terminate her employment.

84. Plaintiff also believes and therefore avers that she was terminated in retaliation for engaging in protected activity under the NJ LAD.

85. The actions of Defendants, through their agents, servants, and employees, in subjecting Plaintiff to a discriminatory hostile work environment on the basis of her race and ultimately terminating her employment for discriminatory/retaliatory reasons, constitute violations of the NJ LAD.

### COUNT IV
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
(Actual/Perceived Disability Discrimination)
-Against Both Defendants-

86. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

87. Plaintiff suffers from a qualifying disability under the NJ LAD.

88. While Plaintiff's blood pressure was well controlled throughout her employment with Defendants, less than a week prior to her termination, Plaintiff informed Defendants' management that she was experiencing flare ups of her disability due work-related stress (partially caused by the aforesaid discrimination she was experiencing) and lack of assistance with her overwhelming workload.

89. At no point in time did Defendants suggest that Plaintiff request a reasonable accommodation, inquire whether Plaintiff needed a reasonable accommodation, or provide her with accommodation paperwork.

90. Instead, less than a week after her aforesaid discussion with Defendants, regarding her disability and recent exacerbated symptoms, Defendants terminated Plaintiff's employment.

91. Plaintiff believes and therefore avers that her actual and/or perceived disability was a motivating or determinative factor in Defendants' decision to terminate her employment.

92. The actions of Defendants, through their agents, servants, and employees, of terminating Plaintiff's employment for discriminatory reasons, constitute violations of the NJ LAD.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay, and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants from engaging in such misconduct in the future;

D. Plaintiff is to be accorded equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F. Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

                                          Respectfully submitted,

                                          **KARPF, KARPF & CERUTTI, P.C.**

                            By:   _____
                                          Ari R. Karpf, Esq.
                                          8 Interplex Drive, Suite 210
                                          Feasterville-Trevose, PA 19053
                                          (215) 639-0801

Dated: March 3, 2025